IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BONNIE J. WILTSHIRE,<br><br>    Plaintiff,<br><br>  v.<br><br>MICHAEL J. ASTRUE, Commissioner<br>of the Social Security Administration,<br><br>    Defendant. | 4:09CV3067<br><br><br>MEMORANDUM AND ORDER |

  This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner"). Bonnie J. Wiltshire ("Wiltshire") appeals a final determination of the Commissioner denying her application for Social Security benefits. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

  On August 29, 2005, Wiltshire filed an application for Title II disability benefits, alleging disability beginning January 1, 1991. Filing Number 9, Social Security Transcript ("Tr.") at 13. She later amended her onset date to January 1, 1997, and subsequently amended it to June 30, 2000. Tr. 13, 732, 760. The Social Security Administration denied Wiltshire's claims initially, as well as upon reconsideration. Tr. 13. At a hearing before an Administrative Law Judge ("ALJ") on August 26, 2008, Wiltshire appeared with counsel, and she and vocational expert Michael McKeeman testified. Tr. 13, 707-755. The ALJ denied Wiltshire's claim. Tr. 13. Wiltshire filed a request for review of the ALJ's decision by the Social Security Appeals Council ("Appeals Council") on October 14, 2008. Tr. 8. The Appeals Council denied her claim on January 29, 2009, and the ALJ's decision became the final decision of the Commissioner. Tr. 5.

**FACTS**

Wiltshire was born on June 4, 1971. Tr. 35. After graduating from high school, she received a two-year Associate of Arts degree in administrative assistance. Tr. 713. Wiltshire testified, however, that she has never worked as an administrative assistant. *Id*. She does have previous work as a customer service representative, a telephone donations solicitor, and various other low-skilled jobs. Tr. 715-720. Her last full-time position of length was a customer service position lasting from February of 2002 to July of 2002. Tr. 98. She testified she quit due to suicidal thoughts. Tr. 98, 716.

The record indicates that Wiltshire sought treatment for depression and mania, as well as difficulties in maintaining appropriate working relationships due to her bipolar disorder. Tr. 722-723. The record also includes letters from Wiltshire's husband describing her inability to perform daily homemaking tasks and from Wiltshire and her former co-worker describing Wiltshire's inappropriate behavior in a work environment. Tr. 110; 114-116, 722-723.

The record establishes a history of psychological issues. Wiltshire reported she was taking Zoloft on January 27, 1997, and was "very depressed" on July 16, 1997. Tr. 315, 326. When she began her treatment at the University of Nebraska Psychological Consultation Center in March of 2000, she reported that she had problems with depression since childhood and was then taking the anti-depressant Zoloft that had been prescribed after the birth of her son in 1997. Tr. 271. In that same report, treating psychologists at the University of Nebraska Psychological Consultation Center diagnosed Wiltshire with Chronic Major Depressive Disorder. Tr. 273.

Further medical evidence shows that Wiltshire was diagnosed by Dr. Kelly Pierce as depressed on October 8, 1999; then began treatment for depression on May 23, 2000; and for bipolar disorder as early as July 8, 2003. Tr. 352, 465, 470. Dr. Pierce has treated Wiltshire since October 8, 1999. Tr. 236-270, 351-562, 626-648. Dr. Pierce's treatment notes contain the following notations: "positive for . . . depression" (October 8, 1999), Tr. 470; "[s]eems more depressed–lost grandmother, wants to increase does of celexa [sic]." (May 31, 2001), Tr. 454; "[s]till depressed" (June 6, 2001), Tr. 453; "[S]he is very depressed and anxious. . . . I told her that I really for sure want her to go [to the emergency room in Colorado while visiting her mother] if she gets any suicidal thoughts." (July 1, 2003), Tr. 401; "[H]er mom is bipolar and her dad is bipolar. . . . Her onset of her symptoms were [sic] in childhood. She has good days and bad days. . . . She has a lot of bipolar tendencies." (July 8, 2003), Tr. 400; and "[i]s positive for bipolar and depression. . . . She has failed multiple . . . [m]edications." (July 28, 2004), Tr. 378. Dr. Pierce wrote a letter in support of Wiltshire's appeal stating a diagnosis of back pain; fibromyalgia; carpal tunnel (left); as well as the "multiple psychiatric issues with bipolar mental illness." Tr. 626.

Observations during Wiltshire's treatment prompted Dr. Pierce to refer Wiltshire to Dr. Stephen Paden, M.D., at the Bishop Clinic on July 8, 2003. Tr. 400. Wiltshire was treated by Dr. Paden for medication monitoring and Jerene Bishop for counseling for over two years. Tr. 604-621, 643. Dr. Paden's diagnosed depression; bipolar disorder, not-otherwise specified; and post-traumatic stress disorder ("PTSD"). Tr. 604-621. Dr. Paden's diagnosis of PTSD was based on Wiltshire's childhood abuse by her grandfather and childhood sexual abuse by her brother. Tr. 612. That diagnosis was later substantiated by consulting psychologist Dr. Stanley R. Carlock and the Social Security Administration's consulting

psychologist Dr. Judy Magnuson. Tr. 580, 672. Wiltshire was admitted to BryanLGH Medical Center on September 9, 2006, with "urges to self-harm." Tr. 643. She remained in the hospital for four days. *Id*.

Dr. Carlock evaluated Wiltshire over at least four encounters from June 30, 2008, through August 5, 2008. Tr. 649-697, 700-706. Dr. Carlock concluded that there was sufficient evidence to substantiate the presence of Affective/Bipolar Disorder (Tr. 659); Anxiety-Related Disorders (Tr. 661); Personality Disorders (Tr. 663); and Prolonged PTSD (Tr. 672).

Dr. Carlock also assessed Wiltshire's residual functional capacity ("RFC").[1] Tr. 652-653. In his report, he determined that Wiltshire was "Moderately Limited" in eight categories[2] and "Markedly Limited" in three categories.[3] *Id*. Addtionally, Dr. Carlock submitted a letter dated September 18, 2008, in which he stated Wiltshire was unable to manage employment and, in his opinion, had been unable to do so for the past 10 to 15 years. Tr. 706.

---

[1]Residual Functional Capacity is defined as the claimant's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, i.e., eight hours a day, five days a week, or an equivalent work schedule. Soc. Sec. Rul. 96-8p. RFC is what an individual can still do despite his limitations. 20 C.F.R. § 404.1545(a).

[2]These are: the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. Tr. 652-653.

[3]These are: the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Tr. 652-653.

At the hearing before the ALJ, Wiltshire testified that she had difficulty maintaining employment because of her bipolar disorder. Tr. 722-723. Specifically, when asked by the ALJ why she left her numerous previous jobs, Wiltshire replied, "[M]y personality would come out. . . . [I] would either start trying to out-manage my managers, or that [I] could come up with a better system than what they had. And when it was recognized, . . . [I] got very emotional. I would either get depressed, or I would . . . [b]ecome angry, and would have a fight with one of my employers. . . ." Tr. 722. In describing her relationships with co-workers, Wiltshire testified that she would "[b]asically intimidate them or antagonize them to the point where they didn't want to be near me, and so they [supervisors] would put me in a different area or, . . . [a]ssign me less hours." Tr. 723.

A vocational expert also testified at the hearing before the ALJ. Tr. 745-751. In answer to a question on Wiltshire's ability to perform work, the vocational expert testified that there was light work in the national economy that Wiltshire could perform with the following limitations: (1) the job does not involve repetitive hand motion; (2) the job involves limited social interaction; (3) and the job would require more than average supervision. Tr. 747-749. The vocational expert testified that the jobs of a janitor/cleaner and maid/housekeeper would fit those criteria. Tr. 748. He also testified, however, that if Wiltshire's testimony of her subjective complaints were credible, there would not be any jobs that she could successfully perform. Tr. 749.

The ALJ denied Wiltshire's claim on September 29, 2008. Tr. 21. He found that Wiltshire was not disabled as of her alleged onset date and as of the date she was last insured, June 30, 2000. Tr. 13. He found that her impairments in 2000 did not meet or equal the impairments listed in 20 C.F.R. Part 404, Subpart P. Tr. 17. He also determined

that Wiltshire had the RFC in 2000 to allow her to perform light work with certain restrictions.[4] Tr. 20-21. He found Wiltshire's statements were not credible because they were inconsistent with the RFC assessment. Tr. 18.

The ALJ specifically noted four inconsistencies. Tr. 18-19. First, the ALJ said that Wiltshire's failure to differentiate between her functioning on June 30, 2000, and at the time of the hearing constituted an inconsistency. Tr. 18. Second, the ALJ wrote that parts of Wiltshire's testimony were "wholly inconsistent" with the rest of the record because even though she testified that she was suicidal and was having a mental breakdown in 2002 and suicidal in September of 2005, she did not seek treatment. Tr. 18-19. Third, the ALJ found inconsistent the fact that Wiltshire told a psychiatrist in June of 2008 that she was "very, very, very suicidal and it just affected everything" during periods of work but did not seek treatment at that time [June of 2008]. Tr. 19. According the ALJ, this was evidence that Wiltshire was "likely" exaggerating the severity of her symptoms. *Id*. Fourth, the ALJ ruled that Wiltshire's co-worker's letter was inconsistent with a diagnosis of bipolar disorder, noting that because the observations that Wiltshire was hyper and did not complete assigned work did not explicitly point to mental instability or suicidal tendencies, they were inconsistent with a diagnosis of bipolar disorder. *Id*.

## STANDARD OF REVIEW

When reviewing the decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the

---

[4]These were: (1) the job would be semi-skilled; (2) the job would be light exertionally; (3) the job would require that Wiltshire work primarily alone; (4) that Wiltshire would require additional supervision to keep her on task; (5) that Wiltshire could lift up to 20 pounds occasionally and 10 pounds frequently; and (6) that in an eight-hour day, Wiltshire could sit or stand for six hours. Tr. 747-748.

Commissioner. *Bates v. Chater,* 54 F.3d 529, 532 (8th Cir. 1995). *See also Wiese v. Astrue,* 552 F.3d 728, 730 (8th Cir. 2009) (stating that the district court could come to a different conclusion is not sufficient basis for reversal). Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Bowman v. Barnhart,* 310 F.3d 1080, 1083 (8th Cir. 2002), quoting *Cox v. Apfel,* 160 F.3d 1203, 1206 (8th Cir. 1998). Under this standard, substantial evidence means something "less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Prosch v. Apfel,* 201 F.3d 1010, 1012 (8th Cir. 2000).

In determining whether the evidence in the record as a whole is substantial, the district court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Holley v. Massanari,* 253 F.3d 1088, 1091 (8th Cir. 2001). If the district court finds that the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision because the record also contains substantial evidence that supports a different outcome or because the court would have decided the case differently. *Id*.

**LAW**

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a); *Singh v. Apfel,* 222 F.3d 448,

7

451 (8th Cir. 2000). The Commissioner determines: "(1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to her past relevant work; and (5) whether the claimant can adjust to other work in the national economy." *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009).

Substantial gainful activity is defined as work that is both substantial and gainful. 20 C.F.R. § 404.1572. Substantial activity is work that involves doing substantial physical or mental activities. 20 C.F.R. § 404.1572(a). Gainful activity is work for which a person is paid or receives a profit. 20 C.F.R. § 1572(b). In addition, a period of substantial gainful employment of short duration is only considered a successful work attempt if it lasts for six months or longer without a claimant's impairment forcing an end to the work or a fall below the "substantial" and "gainful" standards. 20 C.F.R. § 404.1574(c)(1)-(2).

If the claimant is found to suffer from an impairment that is listed in the Appendix to 20 C.F.R. Part 404, Subpart P ("the listings") or is equal to such a listed impairment, the claimant will be determined disabled without consideration of age, education, or work experience. 20 C.F.R. § 404.1525(a); *Flanery v. Chater*, 112 F.3d 346, 349 (8th Cir. 1997). The listings specify the criteria for each impairment that is considered presumptively disabling. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The listings for mental impairments generally consist of a set of medical findings that medically substantiate the mental disorder ("Paragraph A criteria"), a set of impairment-related limitations that show effects of the impairment on functions deemed essential to work ("Paragraph B criteria"), and certain additional functional limitations ("Paragraph C criteria"). 20 C.F.R. Pt. 404, Subpt. P, App.

1, §§ 12.00(A), 12.04. With respect to mental impairments, a certain review technique must be conducted and documented at each level of the review process, including the ALJ level. 20 C.F.R. § 416.920a(a)-(e); *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007) (noting that documentation is generally provided in a standard form).

To be presumptively disabled by reason of bipolar disorder, a claimant must satisfy criteria set forth in the listing for affective disorders in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. A claimant who meets the clinical finding criteria[5] and exhibits two of the four functional restriction criteria[6] is presumed to be disabled by bipolar disorder. *Id*. A claimant is presumptively disabled by reason of an anxiety-related disorder if she presents medically documented findings of generalized persistent anxiety accompanied by at least three of the four listed signs or symptoms,[7] or recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 (A)(1)(a)-(d); (A)(5). A claimant is presumptively disabled by reason of a personality disorder if she has personality traits that are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress exhibited by intense and unstable interpersonal relationships and impulsive and damaging behavior. 20 C.F.R. Par 404, Subpt P, App. 1, § 12.08 (A)(5).

---

[5]"Bipolar syndrome with a history of episodic periods manifested by full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(3).

[6]These are: "(1) Marked restriction of activities of daily living; or (2) Marked difficulties in maintaining social functioning; or (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(3)(B)(1)-(4).

[7]These are: "(a) motor tension; or (b) autonomic hyperactivity; or (c) apprehensive expectation; or (d) vigilance and scanning." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.06(A)(1).

A finding that a claimant's impairment is not equal to a listed impairment does not end the inquiry. *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003). An impairment can be found to be medically equivalent to a listed impairment in Appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526. The determination of medical equivalence is based on medical evidence, supported by acceptable laboratory and clinical diagnostic techniques. *Id*.

RFC is defined as the claimant's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, i.e., eight hours a day, five days a week, or an equivalent work schedule. Soc. Sec. Rul. 96-8p. Although RFC is a medical question, *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000), RFC is not based solely on "medical" evidence. *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (holding that the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including medical records, observations of treating physicians and others, and an individual's own description of their limitations).

It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. *Sims v. Apfel,* 530 U.S. 103, 111 (2003) (noting that "Social Security proceedings are inquisitorial rather than adversarial"). It is well-settled that the ALJ's duty to fully and fairly develop the record includes the responsibility of ensuring that the record includes evidence addressing the alleged impairments at issue from either a treating or examining physician. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) ("The ALJ possesses no interest in denying benefits and must act neutrally in developing the record").

Error exists when an ALJ fails to consider or discuss a treating physician's opinion that a claimant is disabled when the record contains no contradictory medical opinion. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). "[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2006)). The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan*, 239 F.3d at 961. By contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) (holding that is was improper for an ALJ to rely on the opinions of reviewing physicians alone.)

## DISCUSSION

Wiltshire argues that the Commissioner's decision is not supported by substantial evidence, and the Commissioner used incorrect legal standards in denying her claim. Filing No. 1.

The ALJ acknowledged that medical evidence shows Wiltshire is presently disabled, but stated the lack of conclusive evidence of mental illness before June 30, 2000, prevented him from considering Wiltshire's condition disabling before or on that date. Tr. 16. Contrary to the ALJ's conclusion, there is considerable evidence in the record that indicates Wiltshire was disabled in 2000. Nothing in the record suggests that she was capable of substantial

gainful activity. The record shows that Wiltshire had diagnoses of mental illness, including bipolar disorder, depression, and/or PTSD prior to June 30, 2000. Tr. 200, 271, 315, 704, 706. There is no indication that Wiltshire's treating physicians based their opinions upon unacceptable clinical observations or were inconsistent. When Wiltshire was first treated at the University of Nebraska Psychological Consultation Center in March of 2000, she reported that she had been prescribed the anti-depressant Zoloft following the birth of her son in October of 1997. Tr. 271. Social worker case notes from 1997 to 1999 show that Wiltshire exhibited signs of depression during this period. Tr. 315, 326. Additionally, when Dr. Pierce first saw Wiltshire in October of 1999, she noted that Wiltshire was positive for depression. Tr. 470. Since there is no evidence of unacceptable techniques nor any contradictory evidence, these records must be given controlling weight in determining disability as of June 30, 2000.

The evaluation by consulting psychologist, Dr. Carlock, supports the conclusion that Wiltshire was disabled by mental illness before her asserted onset date. Tr. 706. On September 18, 2008, Dr. Carlock expressed the opinion that "[Wiltshire] has been unable to [manage employment] for . . . the last 10-15 years." *Id*. Dr. Carlock concluded that "Despite having received treatment with medication, as well as inpatient and outpatient psychotherapy, she has not been able to achieve stable functioning within her family setting or . . . an employment environment." *Id*. That conclusion is supported by the numerous short-term work attempts that Wiltshire had over the years. Tr. 85-105. The ALJ noted that one of those work attempts supported his decision that she was not disabled. Tr. 19. In his decision, he wrote, "[s]he performed substantial work from February to July of 2002 despite any emotional problem." *Id*. The record shows that the work attempt was five months long,

and that Wiltshire quit the job because she was "having a mental breakdown" and was "suicidal." Tr. 98. The ALJ erred in deeming that as a successful substantial work attempt, as Social Security regulations require a work attempt to be at least six months in duration without a claimant's impairment forcing an end to be considered successful. 20 C.F.R. § 404. 1574(c)(1)-(2).

At the request of the Social Security Administration, Dr. Judy Magnuson performed a one-time psychological assessment of Wiltshire on December 17, 2007. Tr. 577. She diagnosed Wiltshire with PTSD; Depressive Disorder, Not Otherwise Specified; Dependent and Passive Aggressive Features; and Moderate to Severe Problems in Primary Support System, Occupational and Financial Problems. Tr. 580. Although Dr. Magnuson reported that Wiltshire's current mental functioning was satisfactory, stating that Wiltshire "was well oriented, coherent and thought processes were well organized," her report did not negate a bipolar disorder diagnosis. Tr. 579-580. Additionally, Dr. Magnuson stated there were no restrictions in Wiltshire's Current Adaptive Functioning. *Id*. The ALJ relied on Dr. Magnuson's assessment in making the determination that Wiltshire's impairments did not meet or equal the Listings for Affective/Bipolar Disorder, Anxiety-Related Disorders, or Personality Disorders. Tr. 17.

As stated above, Dr. Stanley R. Carlock performed a comprehensive psychological evaluation over at least four appointments from June 30, 2008, through August 5, 2008. He determined that Wiltshire was "Moderately Limited" in eight categories and "Markedly Limited" in three categories. Tr. 652-653. Based on Dr. Carlock's assessment, Wiltshire met or equaled the C.F.R. listings for Affective Disorders/Bipolar syndrome, Anxiety-Related

Disorders, and Personality Disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02, 12.04.

The opinions of Drs. Carlock and Magnuson conflict. Dr. Carlock found that Wiltshire's mental impairments significantly affected her social and mental functioning; Dr. Magnuson found little, if any, negative effects. Dr. Magnuson's opinion is the only medical evidence that supports the ALJ's finding that Wiltshire is not disabled. Dr. Magnuson saw her once as a consulting physician. It is the duty of the ALJ to give a treating physician's opinion controlling weight unless there is *substantial* contrary evidence in the record. *Prosch v. Apfel*, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2006)). Dr. Carlock performed a more extensive and thorough evaluation of Wiltshire, and his assessment is consistent with her numerous treating physicians' diagnoses over a span of ten years. Dr. Magnuson based her opinion on a one-visit assessment. Considering all other evidence in the record, no reasonable mind could find Dr. Magnuson's assessment adequate to support the ALJ's determination that Wiltshire's impairments do not meet or equal the listings. The one-time assessment by Dr. Magnuson pales in comparison to the evidence in the record from Dr. Carlock, Dr. Pierce, Dr. Paden, the treating clinicians at the University of Nebraska Psychological Consulting Center, and case workers. These medical professionals saw Wiltshire on numerous occasions, and there are indications of her chronic mental impairments on over 100 pages of the 811-page record.

The ALJ erred in discrediting Wiltshire's subjective complaints of disabling mental illness. Her testimony is corroborated by testimony from her husband and co-worker and is fully substantiated by the medical record. The ALJ's determination that Wiltshire's subjective complaints are inconsistent with a disabling mental illness is incorrect. He stated that

Wiltshire's inability to differentiate between her functioning on June 30, 2000, and on August 26, 2008, indicated inconsistency. The ALJ's conclusion is not reasonable. The dates span a period of eight years, a considerable amount of time to ask a person to assess and evaluate. Wiltshire has suffered the effects of her condition for many years, including those between 2000 and 2008, and she testified to that fact. Her inability to subjectively differentiate her own condition has little relevance. It may have been the result of trying to recall how she felt eight years ago, unclear thinking, nervousness at testifying before the ALJ, or any number of reasons. Whatever the reason, her testimony is consistent with the medical record as a whole. She suffered the disabling effects of mental illness on June 30, 2000, and continues to suffer; both her testimony and the rest of the record show that. The ALJ also stated that since Wiltshire did not seek treatment or respond to clinic requests for appointments, she must not have been suffering a disabling condition. On the contrary, it is reasonable to determine that if Wiltshire was suffering the effects of a disabling mental illness, she would have great difficulty in setting and keeping appointments. The ALJ also contended that Wiltshire's co-worker's letter was inconsistent with a diagnosis of mental illness because the observations in it do not specifically indicate mental illness. That the letter does not mention a mental illness is not a sound reason to negate it. There is no indication that the co-worker is familiar with mental health determinations and/or diagnoses. She merely reported what she observed of Wiltshire during her employment, and what she reported certainly is not inconsistent with Wiltshire's impairments. All the reasons the ALJ gave to discredit Wiltshire's subjective complaints are not supported by the medical evidence and the balance of the record; therefore, Wiltshire's subjective complaints must be considered.

The ALJ erroneously gave controlling weight to the opinion of Dr. Magnuson in assessing the severity of Wiltshire's impairments. The opinions of Dr. Carlock, Dr. Pierce, Dr. Paden, the treating clinicians at the University of Nebraska Psychological Consulting Center, and case workers support a finding that Wiltshire meets the listings for one or more disabling mental illnesses. The ALJ need not have considered her RFC. C.F.R. § 404.1520(a) (stating that if the claimant meets the criteria of steps 1, 2, or 3, no further analysis is necessary; the claimant is considered disabled and is granted benefits.).

The court finds that the analysis of Wiltshire's case should end at step three with a finding that substantial medical evidence in the record shows her mental impairment meets or equals the listings. Because she is determined disabled at that step, it is not necessary to analyze whether she has the requisite RFC to be able to perform some previous or other work activity. However, even if this were necessary, there is substantial evidence in the record, including Dr. Carlock's assessment (Tr. 649-697, 700-706), Wiltshire's husband's letter (Tr. 114-116), Wiltshire's former co-worker's letter (Tr. 110), Dr. Pierce's letter (Tr. 626), the vocational expert's testimony (Tr. 749), and Wiltshire's own testimony (Tr. 709-745) to support a finding that she is incapable of sustaining employment. Particularly helpful to this determination is the vocational expert's testimony. He testified that there are no jobs that Wiltshire could perform if her subjective complaints are credible. Tr. 749. Wiltshire's subjective complaints are credible; therefore, she is unable to maintain any employment.

## CONCLUSION

The court concludes that the clear weight of the evidence leads to a determination that Wiltshire has been disabled within the meaning of 20 C.F.R. Pt. 404, Subpt. P, App. 1, since her alleged onset date of June 30, 2000. Where further hearings would merely delay

receipt of benefits, an order granting benefits is appropriate. See *Hutsell v. Massanari*, 259 F.3d 707, 714 (8th Cir. 2001), quoting *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984). Accordingly,

THEREFORE, IT IS ORDERED that the decision of the Commissioner is reversed and this action is remanded for an award of benefits. A separate judgment is filed in conjunction with this Memorandum and Order.

DATED this 21st day of July, 2010.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.